THE JAMES T. EASTON.[1]

THE AMERICAN EAGLE.

DOTY *v.* THE JAMES T. EASTON and another.

(*District Court, S. D. New York.* April 23, 1886.)

COLLISION—TUGS AND TOWS—HELPLESS SITUATION—UNWARRANTED SUPPOSITION BY PILOT—HIGH WIND.

While the tug Easton lay about 400 feet off Pier 3, East river, between two canal-boats, which she was about to take in tow, but which were not yet fastened to her, the tug American Eagle came around the Battery, and her pilot, seeing the position of the Easton, supposed that she was about to move ahead, and consequently did not check his speed till his tow collided with libelant's boat, on the starboard side of the Easton. The Eagle's engines were reversed, but the high wind prevailing at the time drove her tow again upon libelant's boat, whereby the latter was sunk. *Held,* that the collision was due to the inattention and fault of the pilot of the Eagle in not keeping out of the way of the Easton, and the unwarrantable supposition that the Easton was ready to move on; *also,* that the Easton was in no fault, as she was where she had a right to be, and was pursuing the customary course, and because her situation rendered her practically helpless.

In Admiralty.

*T. C. Campbell,* for libelant.

*Owen & Gray,* for the James T. Easton.

*Carpenter & Mosher,* for the American Eagle.

BROWN, J. Between 6 and 7 o'clock on the morning of the twenty-fifth of October, 1884, the steam-tug James T. Easton took two canal-boats from the end of Pier 3, East river, out into the stream, for the purpose of towing them to Newtown creek. The tide was slack at the last of the ebb; and the tug, having in the customary manner first backed out with the boats, until about 400 feet from the end of the pier, as I find from the proofs, there stopped, and turned the boats around so as to head towards the Brooklyn shore. She then went in between the two, in order to fasten the libelant's boat upon her starboard side and the other upon her port side. While in this

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

position, and engaged in making the lines fast, and before the fasten-ings were so far completed that the tug could move with safety, the steam-tug American Eagle came out of the North river around the Battery with four barges in tow, in two tiers of two each, upon a hawser of 70 fathoms length, bound for Pier 4, East river. After rounding the Battery the tug's engines were checked so as to shorten the hawser, as usual, preparatory to landing at Pier 4. The wind was strong from the south-west. The pilot, seeing the Easton between the two boats of her tow, supposed that the Easton was ready to move on; and, believing that she would get out of the way, kept on his course directly towards the Easton until the Eagle struck the libel-ant's boat about mid-ships. Little damage was done by this first blow. The Eagle's engines were reversed full speed, but the wind was so high that, though she backed against the barges with her full power, she was unable to check the momentum of the barges, and the tug was forced by them upon the libelant's boat a second time, doing her so much damage by the last blow that she sunk, and became a wreck not worth repairing.

Upon the above facts the fault of the Eagle appears plain. The force of the wind, and its natural effect upon the barges, were known to the pilot, and he was bound to guard against them. *The Ray-mond*, 26 Fed. Rep. 281. The Easton was in the usual place of mak-ing up tows. She was pursuing the usual methods. She was in full view. The pilot of the Eagle understood perfectly that she was tak-ing on her tow, and designing to go up the East river. But his sup-position that she was ready to move on, and would do so before he should reach her, had nothing in the circumstances to justify it. The Easton had done nothing to mislead him, or to induce that supposi-tion. She was lying substantially at rest. There was nothing to prevent the Eagle from stopping earlier, and waiting astern of the Easton until she should go on; or, if the pilot of the Eagle preferred to go ahead, there was nothing to prevent his going upon the outside of the Easton, and crossing her bows upon the proper signal, if there did not seem to be sufficient room to go on the inside of her. There were no other vessels in the way.

Upon the libelant's evidence, which disinterested witnesses con-firm, I am satisfied that there was a space of fully 300 feet clear of water available to the Eagle between the Easton's tow and the piers; and that this was abundant room for the Eagle to go inside of the Easton, even in the strong wind that prevailed, if she had made timely preparations for doing so. The pilot of the Eagle testifies that he rounded the Battery some 600 yards from the shore. He had abun-dant time and space to make proper preparations in season to go in-side of the Easton, directly to his destination at Pier 4. His testi-mony indicates, however, that he did not notice the Easton until off the ferry slip. This was tardy, and shows an insufficient lookout. He then hailed the Easton two or three times to go ahead; but as

the lines were not yet fastened the Easton could not move. The fault of the Eagle clearly was inattention to the Easton in time, and the unwarranted supposition that she was ready to move, and get out of the way.

2. I do not think the Easton can be charged with fault. As I have said, she was substantially at rest. She was as helpless as a vessel at anchor, as she could not move without endangering her tow, which was only partly fastened. She was in no fault in making up her tow in the customary place, and in the usual manner. All the details of this process were familiar to the pilot of the Eagle. She was far enough away from the end of the pier to allow reasonably sufficient room for any boats having occasion to go inside of her to do so without danger. She was not, therefore, an unlawful obstruction to navigation, nor did she interfere with the customary use of that part of the river which is devoted by law to the use of tugs and tows. She had a right to do precisely what she was doing; and, as she was helpless for the time being, the whole duty of keeping out of the way devolved on the Eagle. Being in full view of all approaching vessels, and at a sufficient distance to enable them to keep away from her while getting her tow in readiness to move, her pilot had no reason to suppose the Eagle would not go on one side or the other of him. When he saw the Eagle coming towards him, and not changing her course, he hailed her to keep off. There was nothing that he could do more, since he could not safely move forward or back. There is no ground for holding the Easton in fault. Being at rest, it was not her duty to signal with her whistle to the other tug. If she had done so, by giving either one blast or two blasts, when she was unable to move, she would thereby have misled the Eagle; because such a signal would be telling her, in effect, that the Easton was going to move either to starboard or to port, whereas she could not do either. If any signals were to be given, it was for the Eagle, as the vessel in motion and in command of herself, to give the signal; and no signals were given. The most appropriate answer to any signal from the Eagle would have been several short blasts, to indicate danger. In the case of *The Sunnyside*, 91 U. S. 208, the circumstances were wholly different. The steamer was not at rest, but drifting at the rate of a mile and a half an hour in the night-time, with her helm lashed down; nor was she incumbered by a tow, so as to prevent her moving.

3. The libelant's boat had been long in use, and there is considerable conflict as to her value and soundness. Upon the best judgment I can form upon this point I think she was worth about $400, for which sum, and costs, the libelant may take a decree against the American Eagle, unless a reference be desired. As against the Easton, the libel should be dismissed; but as its answer presented claims which were not sustained, the dismissal in her case must be without costs.