## THE SAM SLOAN.

### DINNINY v. THE SAM SLOAN.

(District Court, S. D. New York. November 30, 1894.)

COLLISION—HELL GATE—HALLETT'S POINT—OVERTAKING—CROWDING—SIGNALS DELAYED—ABSTRACTION OF RECORD.

The large passenger steamer S. S. in going eastward through Hell Gate against the strong ebb tide, overtook and came in collision with the yacht A. in rounding Hallett's Point, going very near shore between A. and the point. The evidence was conflicting as to which boat swung against the

other. *Held*, (1) that in the absence of impeaching testimony, a vessel's own witnesses as to her maneuvers are more trustworthy than the evidence of persons on another moving vessel, and that it was the S. S. that in this case swung against the yacht, upon meeting the strong ebb tide; (2) that the steamer was solely to blame for attempting to round that dangerous point so near the shore, meeting the tide so suddenly, and attempting to pass the yacht in that situation; and for not signaling earlier; also *held*, (3) that the unexplained abstraction from the files of the local inspectors of the first report of the S. S., and the filing of an amended report four days after, both of which were in the handwriting of a clerk of the claimant, was irregular and unlawful, and presumably chargeable upon the claimant, and would throw discredit on the claimant's case if the merits were otherwise doubtful.

This was a libel in rem by Ferral C. Dinniny, Jr., against the steamboat Sam Sloan, to recover for damages sustained by collision.

Benedict & Benedict, for libelant.

Stewart & Macklin, for claimants.

BROWN, District Judge. At about noon on the 1st of July, 1894, as the libelant's steam yacht Aztec, about 80 feet long by 14 feet beam, was going eastward through Hell Gate, and rounding Hallett's Point, she was struck on her starboard quarter, near the stern, by the overtaking side-wheel passenger steamer Sam Sloan, bound for Glen Island. The yacht's stern was carried away, and she ran a few moments afterwards upon the rocks near the lighthouse, and became, as is claimed, a total loss, to recover for which the above libel was filed.

The yacht had come up on the easterly side of Blackwell's Island, and when at the upper end of the island, and near the Astoria ferry, she was somewhat ahead of the Sam Sloan, which had come up on the westerly side of the island. The yacht, under the supervising inspector's rules, had, therefore, the right of way, and the Sloan was forbidden to pass her in Hell Gate. The Sloan had many passengers on board. She was going considerably faster than the yacht, and from Blackwell's Island had come up on a course slightly crossing the channel and heading a little toward the Long Island shore; so that when she had reached a point a few hundred feet below Hallett's Point light, she had come within about 80 feet of the shore. When making the turn to starboard, she gave a signal of one whistle to the yacht when very near her, meaning that she wished to pass the yacht on the right, between her and the shore, to which the yacht gave an answer of one whistle. Almost immediately afterwards, the vessels were in collision, as above stated.

There is no dispute as to the principal facts, except those that happened a few moments before collision. The Sloan contends that the yacht, instead of keeping her course and permitting the Sloan to pass, ported her wheel and swung around to starboard, right across the bows of the Sloan, when so near that the Sloan could not avoid her. The witnesses for the yacht testify that the bow of the Sloan swung to port, and striking the starboard quarter of the yacht near the stern, threw her stern to port so that the yacht, being near the shore, and going in the water at about ten knots, ran speedily upon the rocks.

Most of the testimony, and its apparent discrepancies, excepting, perhaps, the pilot's location of the collision, which is manifestly grossly erroneous, is easily capable of being reconciled by the fact that persons on one boat observing the motions of another are apt to ascribe apparent changes of position to the other boat rather than to their own.

"Daily experience in the trial of collision causes," says Blatchford, J., in McNally v. Meyer, 5 Ben. 240, Fed. Cas. No. 8,909, "shows that nothing is more unreliable than testimony from those on one moving vessel as to the absolute actions of another moving vessel. The irresistible propensity is to regard your own vessel as stationary with reference to the other vessel, and to attribute all deflecting movement to the other vessel."

Accordingly, the ordinary rule in cases of conflict, is to give superior weight to the testimony of a vessel's own men as to her movements, rather than to that of those on board the other moving vessel, when the former are in no way discredited by other testimony, or by the circumstances and probabilities of the case. The Governor, 1 Abb. Adm. 108, 113, Fed. Cas. No. 5,645; The Neptune, Olcott, 495, Fed. Cas. No. 10,120; The Glaucus, 4 Cliff. 166, Fed. Cas. No. 683; The Empire State, 1 Ben. 60, Fed. Cas. No. 17,586; The Columbia, 29 Fed. 716, 718.

The situation, and the well-known conditions of navigation in rounding Hallett's Point, afford an easy, and no doubt a true, explanation of this collision, and of the contradictions in the testimony concerning it. The tide was strong ebb; the yacht had come up close to the easterly shore, keeping in the eddy until near Hallett's Point. In attempting to pass around the point under a port wheel, on running out of the eddy near shore into a strong ebb tide, the swift current would necessarily set the yacht's stem a little to port, though she would quickly recover herself and turn to starboard. The yacht had ported, and was attempting to make the turn before the Sloan's signal to her was given. As the yacht passed up near the Astoria shore before reaching the point, she had seemed to persons on board the Sloan to cross the Sloan's bows from starboard to port, although she had in fact kept straight up the channel course along the shore, because the Sloan was headed a little towards the land and continued this course until she brought the yacht on her port bow.

When the Sloan straightened up within 80 feet of the shore, only a little below the turn of the point, and undertook to go to the right of the Aztec, she gained very rapidly on the yacht, which was then in the stronger ebb current; and it was impossible for the Sloan to port her wheel while so near the shore, until she reached the turn; and then the swift ebb struck her starboard bow with such increasing force as she rapidly approached the Aztec, as the latter was rounding the point, that her bow was carried to port against the Aztec's starboard quarter, giving the appearance to those on the Sloan of that sudden sheer by the Aztec across the bows of the Sloan to which the latter's witnesses testify. This would agree substantially with the testimony of the Aztec's witnesses, whose testimony

on this point is the more credible. The collision was a little to the westward of the light along the turn, and within 100 or 200 feet of the shore. There was nothing to cause the Aztec to swing towards the shore; every influence was to the contrary.

The blame for the collision must rest wholly upon the Sloan, whose duty it was to keep out of the way of the yacht: (1) For attempting to pass the Aztec while both were rounding the turn at Hallett's Point so near to the shore, the most dangerous place in Hell Gate; (2) for delaying her signal to indicate her purpose, until she was close aboard of the Aztec, when there remained no time for safe maneuvering. The attempt to pass in that way was in the highest degree dangerous. The pilot's testimony shows, that the Sloan pursued her usual course, regardless of the presence of the yacht; that she ported her wheel to turn the point inside of the yacht, without waiting for the Aztec's reply; and I credit the testimony of the Aztec's witnesses, that the signal was not given until the Sloan was very near to the yacht; so near that the Aztec, whose slower speed was still further diminished by the strong ebb she was meeting, had no time to do anything effectual to prevent collision. The Aztec's answer of one whistle was immaterial. It did not induce the Sloan's course, which was taken before the reply, and when so near that the reply made no difference.

The case in its essential features, is much like that of The Governor, above cited, although in the present case the attempt of the overtaking vessel was even more dangerous than in that; and as in that case, the whole responsibility must rest with her.

Another circumstance on the part of the claimant ought not pass unnoticed; viz., the abstraction of all the material parts of the first report made by the master of the Sloan concerning this collision, and filed in the office of the local inspectors, pursuant to law, on July 2d, the day following the collision. On July 6th, what is termed an amended report, was filed, and nothing now remains of the original report except a few lines of the beginning; all the rest having been torn off. So far as could be ascertained no one knows by whom this was done. What it amounts to is both a suppression of the original official account filed by the party charged with fault, and also an abstraction of a part of an important official paper from the official custodian, serious misconduct in both points of view. If the custodian had authority to permit an amended report to be filed, there was no authority to permit any removal or obliteration of the one already on file. Both reports were in the handwriting of a clerk in the claimant's office; and without explanation, the claimant would inferentially stand chargeable with the responsibility for this abstraction. If there were otherwise any doubt about the merits of the collision, such an abstraction of the original report would reasonably throw great discredit on the claimant's side of the case.

Decree for the libelant, with costs.