## THE GEORGE W. ELDER.

### (District Court, D. Oregon. February 3, 1913.)

### No. 5,162.

1. COLLISION (§ 125*)—SIGNALS OF APPROACHING VESSELS—WEIGHT OF EVIDENCE.

The testimony of the officers and men on a vessel, corroborated by other witnesses not on board, that she heard the first passing signal from an overtaking vessel, and answered by a danger signal, *held* entitled to greater weight than the negative testimony of those on board the overtaking vessel that they did not hear any answer to their signal.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 266–279; Dec. Dig. § 125.*]

2. COLLISION (§ 94*)—CONSTRUCTION OF RULES—OVERTAKING VESSEL—VESSEL "UNDER WAY."

A vessel which, while not moving through the water, was neither anchored nor moored, but was engaged in making fast to tows, was "under way" within the meaning of the navigation rules, and another vessel approaching her from astern was an overtaking vessel, and under the Inland Rules of June 7, 1897, c. 4, art. 24, 30 Stat. 101 (U. S. Comp. St. 1901, p. 2883), it was her duty to keep out of the way of the one ahead, and she was forbidden by article 18, rule 8, to pass without an agreement.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 197–199; Dec. Dig. § 94.*

For other definitions, see Words and Phrases, vol. 8, p. 7161.]

3. COLLISION (§ 95*)—OVERTAKING VESSELS—ATTEMPTING TO PASS WITHOUT AGREEMENT.

As the steamer Kern was making fast to her tow of stone barges at night in the channel of the Columbia river, where she changed tows with another downbound steamer, the steamer Elder approached from above and when half a mile distant gave a passing signal of one whistle. The pilot of the Kern, seeing that the Elder was apparently approaching head on at a speed of 12 miles or more, and had not changed her course, answered with an alarm signal. The Elder proceeded without changing course until about 1,000 feet distant, when the same signals were again exchanged, and the Elder then reversed, but too late to avoid a collision, in which the Kern was sunk. *Held*, that it was not a fault for the Kern to pick up her tow in the fairway, nor that she did not have a lookout on duty at the time, since she saw the Elder as soon as the latter came in sight, but that the collision was due solely to the fault of the Elder, which as the overtaking vessel was under the duty to keep out of the way, and might have avoided the collision by changing her course when the first signals were exchanged.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

In Admiralty. Suit for collision by the Columbia Contract Company, owner of the steamer Daniel Kern, against the steamer George W. Elder, Charles P. Doe, claimant. Decree for libelant.

The Columbia Contract Company was at the time of the collision herein complained of the owner of the Daniel Kern, and was engaged in conveying rock from Fisher's Quarry, situate on the north bank of the Columbia river above Vancouver, Wash., to the government jetty below Ft. Stevens, at the mouth of the Columbia river. Barges were employed in transporting the rock, three being lashed together side by side in such a way that the center

barge extended forward of the others nearly half its length. These barges, when so made fast to each other, were towed by steamers. The steamer-made fast to the tow by mooring with her prow from the rear of the barges between those on the outer sides, and in this way the tow, consisting of the three barges, was navigated by pushing it ahead of the vessel. On the day of the accident libelant was operating two tows thus made up, with two steamers, the Daniel Kern and the Hercules. The Kern was engaged in navigating the tow, consisting of empty barges, from Ft. Stevens up the river to where she met the Hercules, navigating a tow consisting of loaded barges from the quarry. There the steamers would exchange their tows, and each proceed back to its starting point. Thus the Kern operated on the lower river and the Hercules on the upper. The reason for this was that the Kern was of deeper draft than the Hercules, and better suited to navigate the waters at the mouth of the Columbia, and the Hercules, being of lighter draft, could reach the quarry in greater safety. These vessels, during the time they had been thus operating in conjunction with one another, had generally met at some point between Waterford Light and Oak Point above. In making the exchange of tows the Kern on meeting the Hercules would proceed some distance above with her empty barges, when she would let go of them, and return to make fast to the loaded barges in tow of the Hercules.

The Kern is a vessel 153 feet in length and about 26 feet beam, and the barges which were being taken in tow at the time of the collision ranged from 142 to 152 feet in length and 35 to 36 feet beam.

On the night of the collision the Kern met the Hercules somewhat above the Waterford Light at about 12:30 a. m., the former proceeding up the river to a point abreast of or a little above Cooper's Point, where she let go of her tow well out of and to the south of the fairway or ship's course. The Kern then returned, meeting the Hercules, which had let go the loaded barges, between Cooper's Point and Waterford Light. The Kern approached, and began to maneuver to make fast to the loaded barges. In the meantime the barges had swung around until they assumed a position nearly crosswise to the stream, their bows pointing slightly down stream and towards the Oregon shore. The Kern came up by their stern, heading approximately downstream. Her bow had entered past the port barge quartering, so that her nose was pointing nearly to the port quarter aft of the starboard barge, but not touching it. Neither was she against the stem of the port barge. A line had been made fast to the starboard quarter of the port barge (the chief officer of the Kern says to the port quarter, and that the Kern's nose lay past the port quarter of the starboard barge), and, as it was about ready to be tightened up from the Kern, the Elder came into collision with her from the rear. There was at the time some slack in the line, one witness saying about five feet, others being not so definite.

The position of the Kern and her tow at this time was nearly opposite the Waterford Light, instream from the Washington shore approximately 1,000 feet, and practically in the fairway or ship's course for vessels of heavy draft. The stream was about a mile wide, and navigable for heavy draft ships up to within from 100 to 40 feet of the Washington shore, and for a half-mile on the other side of the Kern.

The Elder is a ship 250 feet in length, with 38-foot beam, running on the night of the accident with 17 or 18 feet of draft at the stern, and some 4 feet less at the bow. She is navigated by a screw propeller, and her helm is operated with hand gear. She was proceeding downstream, and struck the Kern on her starboard quarter, about 16 feet from her stern, at an angle near 34 degrees, protruding into her to near her middle line, and breaking her wheel-shaft. The Kern was thus jammed against the barges on her port side; the barges being thrown around until their bows were headed directly upstream. The Kern was shoved around until she stood across the stream, heading towards the Washington shore, where she sank from the injuries sustained. The night was dark, but clear, and the water slack, with no appreciable current, possibly the first of the flood. As to these facts there is no substantial controversy.

Michael Moran, the pilot in charge of the Kern, relates that, while standing in the pilot house on the starboard side, looking out of the window forward, he heard one whistle. On hearing it he went out the door on the starboard side, and saw the Elder coming right at him, and appearing to him to be a short distance away. He took note to ascertain if she changed her course, and, observing no change to shut out her "signal lights," went in and gave four short blasts of the whistle. This was probably a second or so after hearing the first whistle. His first thought was that the Elder was going to run him down. After blowing the four blasts he jumped outside again, by the starboard door, on the bridge, stood there for a few seconds, and got one whistle from the Elder. The Elder's course continued as before, and witness could see her green and red lights and her masthead light, having seen the same lights when he heard her first whistle. He could see no change in the Elder from the time he saw her before, and she was headed right for him. She was then getting so close that the witness stepped back into the pilot house, and gave four short blasts—"gave the danger whistle." He sprang outside again to watch the Elder. She was then coming right head on, and he noted no change in her course. Waiting awhile, he observed her swinging to port, and, concluding that she was backing, rang the Kern full speed ahead to avoid a collision. The Elder was then 25 or 30 feet away. The Kern's helm was aport. This when the boat got in action would swing her bow towards the Washington shore, and her stern in the opposite direction, and bring the Elder across on her starboard quarter. Only a few seconds elapsed between the time of the first four blasts given by the Kern and the second whistle of the Elder—"only a short time anyway, very short," and probably a second or so between the Elder's second whistle and the Kern's last four blasts. The effect of the collision was that the headline of the Kern came tight and swung the barges along her side, heading upstream. If no change had taken place in the Kern, the Elder would have struck her a little aft. Using witness' language: "I had to look right aft from the Kern's bridge, and the Elder was coming right directly astern of me, a little the starboard quarter as near as I knew, but as near as I could judge pretty well astern and headed right for me." The searchlight on the Kern was being used to assist the men on the barges, and was not thrown upstream at any time. The witness was then asked: "What reason, if any, Captain, did you have for responding to the one-blast signal of the Elder with four short blasts? A. Well, my reason was that I concluded there was nothing going to happen but a collision, that he was going to run right into me, and I thought I would warn him of the danger he was approaching. Q. Why did you think there was going to be a collision? A. Well, I could see by his lights—judging the way he was heading by his signal lights—he was heading right for me all the time. Not making any attempt to alter his course that I could notice. * * * Q. At that time will you state whether or not he was swinging or whether or not his lights were stationary or how they were? A. They seemed to me to be about steady. He seemed to be coming right head-on to me steady. I couldn't notice any change of his signal lights. If he was swinging, I couldn't notice it. Q. How was the room between you and the Washington shore? A. There was considerable room there, anyway from twelve to thirteen hundred feet of room, as near as I could judge. * * * Q. In view of these facts, why didn't you give him—respond with a one-whistle signal? A. Well, I would have if he had shut out his green light. I would have given him the regular passing whistle, but he didn't make the attempt to do it, and I thought it was my place to give him the danger whistle. On account of laying still and the rock barges on my port bow, I couldn't comply with his whistle to go ahead on the starboard helm, was my reason for doing it." Witness says, further, that the danger signal on the Columbia consists of four short and rapid blasts of the whistle. To the best of his judgment, the Elder would have run into the stern of the Kern if the Kern had not gone ahead on her engine at the time she did. On cross-examination witness said he thought the Kern probably moved 30 to 40 feet in the water from dead in the water until the Elder struck her, and that there was very little change in her position unless she swung around a little on account of her helm

being aport. When he first saw the Elder, she was probably 800 or 1,000 feet away. It was a dark night, and all he had to go by was the appearance of the masthead light. Then witness was asked: "What did you do when you first saw her? A. Well, the first time I saw her, I waited until I see whether he was altering his course or not, and he didn't appear to alter his course one particle by his signal lights, and I jumped in the pilot house and gave him four short blasts of the whistle in answer to his one whistle. Q. Did he have to alter his course before you had given him your answering whistle? A. Well, not necessarily. Q. Now, as a matter of fact, the rule requires that you shall give him an answering whistle before he alters the course, doesn't it? A. That is up to me, whether I think I am in danger of being run down. It is up to me to sound the danger signal or up to me to judge whether there is any danger." Further on he says: "When he was heading right for me, I thought it was well to indicate the danger he was approaching. That is what made me give the danger signals." Being asked, "And the only thing he could have done when he got the four-whistle signal was to reverse his propeller, wasn't it?" witness answered, "Well, he could have went either way or backed up then. It is up to him to judge, according to my notion and according to the rules, too." He further states that, after he let go the empty barges in going down to the Hercules, he got right close to the loaded barges; the Hercules having just backed out in order to let him go in. Being recalled, he testified: "Q. Now, as I understood you yesterday, you said the reason why you blew the four blasts was because you could not see him moving over to your starboard at the time he asked for permission to go over there with the one whistle signal; that is correct, is it not? A. That is correct; yes, sir. Q. And he had abundant time to have gone over there when he was a thousand feet away without striking you, had he not? A. He had if he had a mind to do it; yes. Q. And your theory of the case is that, before he got any response from you, he should have put his helm over to port and started to make that maneuver? A. That is what I understand the law, to accompany the whistle by the alteration of your helm so as the other man can know what you are doing."

J. E. Copeland, the master of the Kern, was in the pilot house at the time of the collision. He had retired to his room and gone to bed, but was awake. The first intimation he had of the approach of the Elder was a whistle which he heard from her. He says the Kern immediately blew four whistles—"almost immediately, as soon as the pilot could blow the four whistles he blew them." He then heard the Elder blow one whistle again, "almost immediately" after the Kern had blown the four whistles, and "the Kern blew four whistles again." This was also "almost immediately" after the Elder had blown her second whistle. He was on the floor of his room when the Kern blew her last four whistles, went from there into the pilot house, looked out the starboard door, saw the Elder coming astern of the Kern headed right for her, and could see all three of the Elder's lights burning. She appeared as if she were coming down past the stern of the steamer, but heading almost amidships—"maybe a little aft of midships." He turned to the wheel and found it over to port, and lashed. About that time the Elder struck the Kern. The latter was then working full steam ahead. She had probably moved 30 or 40 feet—not to exceed 40 feet, when struck. Her stern swung to port. Witness was of the opinion that had the Kern's helm been put hard to starboard, and the ship worked full steam ahead, she would not have gotten out of the way of the Elder at the time he saw her, as "they were too close. She (the Kern) could not possibly have gotten out of her way." He was then asked: "How soon did you see them after the last four whistles were blown? A. Well, it could not have been more than a few seconds, because just as the four whistles were blown he gave a bell to go ahead, and that was at the time I was stepping in the pilot house, and I immediately went to the starboard side, looked aft and saw the Elder. Q. How far aft would you think the Elder was away at that time? A. I would not think she was over 40 feet." He further says that on hearing the signal from the Elder he would have done as the pilot did in sounding four whistles, and he would have put her helm aport and turned

her full speed ahead; that if the Kern had succeeded in getting out of the way, with the Elder headed as she was when he first saw her, the latter would have struck the barges. At the time of the collision the Kern was swinging, which would bring her over at an angle with the Elder whether the latter was swinging or not. Using the language of witness a little further on: "The Kern's movement would have thrown us to the side of the Elder's bow whether the Elder would have been swinging or not. If the Elder had come directly ahead, you understand, the movement of the Kern would have directed the Elder right into our starboard side." Witness was of the opinion that, if the Elder had been on a swinging course to port for 1,000 feet, she would not have hit the Kern, because she would probably have stopped before she got that far. If she was on such a course for 500 feet, and had been directly behind the Kern, she would not have struck, but she was a little to the starboard of the Kern.

Joseph O. Church, the master on the Hercules, says he passed the Elder "just a little below Cooper's Point—not much, * * * probably a thousand feet off shore." The Elder exchanged one whistle with the Hercules; the Elder giving the first whistle. After passing the Elder, witness heard the Elder give a passing signal with one whistle, and the Kern responded with four short whistles. The signals were "pretty close" together—"about the usual time." Right afterwards the Elder blew another whistle, and the Kern again responded with four. The Kern answered supposedly a quarter of a minute after the Elder signaled. Witness heard the crash when the collision took place, and at that time was just about to his barges, "just about going in between" them.

George Hale, the mate on the Hercules, heard the exchange of signals between the Elder and the Hercules and the Elder give a passing signal afterwards, and the Kern give the danger signal, four short whistles. A little further on he says: "I heard the Kern blow her danger whistle twice. The Elder only blew once to my knowledge." The Elder blew her whistle to the Kern just as the Hercules was abreast of her.

Hans Jensen, assistant engineer on the Kern and in charge at the time, heard the signal from the Elder and reply from the Kern repeated as described by other witnesses. After the exchange of signals, he received signals from the bridge of the Kern full speed ahead, and acted accordingly. This was not over five or ten seconds after the second series of whistles was given, and it was not over 15 seconds until the collision occurred. Later the witness says about half a minute. The engine, he says, had probably made between 50 and 60 turns when it occurred, and the vessel would get some way at 25 revolutions.

Charles W. Spaulding, the engineer on the Kern, was in his room at the time, but heard the signal from the Kern with four whistles, and heard that repeated, and after that a succession of whistles, then the crash. He was of the opinion that one or two minutes elapsed between the time of the first and second four whistles of the Kern.

Arne Arneson was a deck hand on the Kern on the forecastle head at the time. He heard the signals exchanged between the Elder and the Kern, first a signal, one whistle, from the Elder, answered by four short blasts from the Kern, "and about—not quite a half a minute afterwards the Elder blew one whistle again." Then the Kern blew four short blasts again. The headline was at the gipsy head, and witness was about to "heave in on it," and the boat was going to back up, to swing the barges around so it could "get into them." Witness saw the Elder at the time he heard the first signals exchanged, and says she was about a half-mile above, "right astern of us," and that he could see all her lights. He saw her while she approached, and she did not change her lights until after she blew her second whistle, when "she kind of swung off to the Washington shore." At the time he heard the bells signaling the engineer the Elder was from 50 to 75 feet away, and was headed about midship of the Kern. On cross-examination, witness said he thought the Elder was "just abreast Cooper's Point" when he heard her first whistle, and that about two minutes' time elapsed before she struck the Kern—"between two and three minutes."

Arthur Nissen testifies that he was fishing at the time opposite Eureka cannery, perhaps a mile out, and heard the exchange of whistles between the Elder and the Kern. He says the Elder blew one whistle, the Kern answered with four, and this was repeated, and that an interval elapsed between the various whistles of perhaps a half-minute. He heard the collision, and knew that the Kern sank, as her lights disappeared.

Edward Anderson was chief officer on the Kern, and on the forecastle head at the time of the collision, directing in getting a line to the tow. He saw the Elder approaching, saw all her lights, which indicated that she was coming head on, noticed her at Cooper's Point when she blew her first whistle. She was shifting her course from Cooper's Point, which would be about a quarter of a mile from the Kern. The Kern answered with four whistles immediately. Next the Elder blew one whistle, and the Kern blew four. A very short interval elapsed between the Elder's second whistle and the Kern's four, and the collision occurred very shortly after the Kern blew her second four whistles. It "might have been a minute—a minute or so." Witness continued to observe the Elder's approach, and the same lights were visible all the time. After the Elder blew her second whistle, he sang out to the men on the barges to let go the line, in trying to get clear, as he saw there was to be a collision. A signal full speed ahead was given the Kern about this time, which was a couple of seconds before the collision, but the Kern "didn't pick up much." The Elder, when he saw her astern, was running for the Kern's quarter.

On the part of the respondent W. H. Patterson, the pilot on the Elder, was called, and testified that the maximum speed of the Elder is 11 or 12 knots; that she minds her helm "first-class," has a left-hand propeller, and backs to the starboard, thus throwing her bow to port, and, if running under full speed, she will swing to port. When he rounded Cooper's Point, he saw a vessel ahead which proved to be the Kern. He could not see any side lights, which indicated to him that the vessel was going downstream. His course after passing Cooper's Point was down the Washington shore, aiming to keep off all the way from 600 to 800 feet in the locality where the Kern was lying. On that night, when he saw the Kern, his course would have taken him in the vicinity of 400 feet from shore. When he received the signals from the Kern, he testifies he must have been 1,500 feet or more away—"about 1,500, between 1,200 and 1,500 feet." The other vessel was then on his port bow. Witness further relates that, when he first came down by Eureka channel and came around Cooper's Point, he saw a vessel ahead and pulled his vessel around so he had the former on his port bow about a half-point, which position he maintained until he got a signal from her, the same being in response to a signal from him. He then ordered the officer on the bridge to stop his vessel, and put her engines full speed astern, which was done immediately. This threw her stern to starboard and her bow to port. The signal from the Kern he interpreted to be "either a cross whistle or a danger whistle," and he supposed there must be some obstruction in the water ahead. He struck the Kern at about right angles. The response he got from the Kern was to a second signal he had given. He had given one before the signal that the Kern answered.

On cross-examination he says he met the Hercules with the light barges in tow probably a quarter of a mile above Cooper's Point; that, when he got the danger signals and put his ship full speed astern, he knew there was danger ahead of some kind; that he could see an obstruction ahead, and knew a collision was imminent. He ported his helm just after passing Cooper's Point, so as to put the Kern on his port bow, which course was designed to put the vessel down by the Kern about 400 feet off the Washington shore. Supposedly this course would take him 200 feet from the Kern. Witness further says he ordered his helm to starboard at the same time he put his vessel full speed astern for the purpose of throwing the ship off as much and as quickly as possible. He blew one whistle after rounding Cooper's Point, and just after he ported his helm. To this he received no reply; and then he blew another whistle "a few minutes, almost immediately after," when he found the Kern did not answer. Using the language of the wit-

ness: "I seen I had plenty of room on the inside and I told the officer on the bridge to blow another whistle, for I seen I had plenty of fairway to go about my business clear." By backing and starboarding the helm he expected both to stop the vessel before reaching the Kern, and to steer clear of her. Witness further says he slowed his ship down when he blew the first whistle.

He was then asked, and answered as follows: "Q. Captain, if your steamer is running full speed ahead—exactly what I asked before—if your steamer is running full speed ahead, can you stop her within three-quarters of a mile? A. Well, as I said a minute ago, it depends entirely upon circumstances—depends upon— Q. Under the conditions that prevailed there that night, we will say? A. Well, I ain't able to say. I might have said that there, but I don't know as I could tell exactly. As I said to Edwards at that time, I couldn't tell. Q. Did you say you could or no, sir, you couldn't do it? When you told Capt. Edwards you couldn't. He said, 'How long does it take the Elder backing full steam astern to check her headway? A. Well, I should judge in the neighborhood of probably three minutes. You see, we was making—well, yes, in the neighborhood of three minutes.' When you made that answer you had in mind the conditions prevailing that night? A. I might have said that. Q. (continues reading) 'Couldn't her headway be stopped and her going astern within three-quarters of a mile? A. No, sir. Q. It couldn't? A. No, sir. Q. You couldn't reverse and back her full speed astern, and check her headway in three-quarters of a mile? A. No, sir.' Now, you didn't misunderstand Capt. Edwards' question, did you? A. I don't suppose I did. Q. Now, then, you knew then that when you backed your engine full speed astern within a distance of 1,000 to 1,500 feet of the Kern it was absolutely hopeless to stop before you reached the Kern? A. No; I didn't. I thought it would swing her far enough so she wouldn't catch us. Q. To port? A. Yes. Q. You knew you couldn't stop the ship within that distance? A. I wasn't sure; might have stopped her." Later he further testified: "Q. Now, then, Captain, when you came around Cooper's Point and gave the first signal of one blast to the Kern, you didn't know whether it was safe for you to go by or not, did you? A. I did at that time, yes. Q. You did? A. Yes; because I could see I had this vessel on my port bow and there was an opening there, could have gone through on my own business. Q. Did you know the conditions ahead? A. No. As far as I could see at that time and the conditions in the— Q. You don't know whether it was safe or not? A. I could go there. Mr. Denman: Do you contend it wasn't safe in there? Q. You didn't know it, did you, Captain? A. Yes, the indication looked favorable to me—it was all right—I could go down with safety. Q. So you continued on your course? A. I did, certainly. Q. Despite the fact you received no response from the Kern? A. I kept on my course because she was on my port bow, and I knew I could go by safely, so far as I could see. Q. Nothing there so you couldn't get through? A. Not at that time." Later he answered: "We are supposed to blow a half a mile off, and, as far as my judgment would allow me, I blew a whistle a half a mile off [the first whistle] after I got around the point."

Edward Whiteman, the third mate on the Elder, says in effect that, after the Elder rounded Cooper's Point and sighted the Kern and got straightened out, she was steering down for Waterford Light, inside of the Kern and barges, so that the Elder had her on her port bow, in which course the Elder continued until she was cross-signaled, being about 1,200 feet away when the cross-signal came. The Elder's engines were reversed, she was put full speed astern with her helm starboarded, the purpose being to make her stern swing to starboard and her bow to port, which would give her a curving course through the water. She struck the Kern on that course. Witness was of the opinion that, if the Elder had been right behind the Kern and 500 feet away, there would have been no difficulty in clearing her to starboard, and unquestionably none if the Kern had been 1,000 feet away. Witness says he kept ringing the telegraph full speed astern because he could see they could scarcely avoid a collision. Being so close to the Kern, it was necessary to have all the steam possible to stop her. He was under the im-

203 F.—34

pression that the Kern blew two whistles twice, though "there is room for a doubt." He saw the reflection of the towing lights on the Kern at the time he blew the first whistle, and knew she was there heading down the river, but did not know it was the Kern. The Elder blew one approaching passing signal as she was rounding Cooper's Point on the starboard helm. Immediately on blowing the first whistle, witness "slowed the ship down dead slow," and kept on his course. Getting no response whatever to the first whistle, he blew a second whistle, and then came "the two short whistles twice," which indicated that the Kern either wanted the Elder to go over on the other side, or else there was an obstruction in the river that he could not see, "that there was danger somewhere." "We were so close to him that the only thing we could do was to stop and reverse full speed astern. * * * On either theory we could not do anything else." On cross-examination he said he repeated the signal, he supposed, within about a couple of minutes or so. Witness says: "When he didn't give us a response to our first whistle, I slowed the ship down, and then blew again the same signal, one whistle to indicate that I wanted to pass on his starboard with our port side, between him and the Washington shore." The time elapsing between the two signals was anywhere from a minute to a minute and a half. Witness continued as interrogated: "Q. Well, then, which whistle was it you didn't get response to? A. The first whistle. Q. Then did you continue running on towards her? A. After slowing the ship down, yes, sir; but we were clear of him. We had him on the port bow. Q. You did? How far? A. Oh, about half or three quarters of a point. Q. And how far would that bring you off the Washington shore? A. Off the Washington shore? Q. Yes. A. Well, it would have brought us away off, clear of the Washington shore. We were all right as far as the Washington shore was concerned. Q. Bring you about 400 feet, would it? A. Yes. Q. And, if you had her a point or three quarters of a point on your port bow, that would shut out your green light from her wouldn't it? A. Our green light? Q. Shut out your green light from the Kern, wouldn't it? A. It should; yes. Q. And, if it didn't shut your green light out, then you didn't have her a point or three-quarters on your port bow? A. No; we didn't." Witness could see the Kern's lights when he was a little above Cooper's Point.

Harl Asktedt, the quartermaster, saw some lights after the Elder rounded Cooper's Point, and so far as he could remember the Elder had the Kern about a half-point on her port bow. He thought the Elder was about three-quarters of a mile from the Kern when she blew the first whistle, and about one-eighth of a mile when she blew the second. At that time he got command to put the wheel aport, and then hard to starboard, and to stop her full speed astern. The orders were executed. So far as he remembered, they got no response to the first whistle. Then the Elder blew another whistle, and the response was either two or four whistles. The Elder was put astern as soon as she got the response. She blew the second whistle immediately after the first. She struck the Kern almost immediately after he got his wheel hard over to starboard. The Elder did not swing much, so far as he remembered.

Louis Olson, a lookout on the Elder, testified the Elder blew one whistle when she was about three-quarters of a mile away from the Kern, then she blew another, and at the time the Kern was about a point on the Elder's port bow. The Elder was about 1,000 feet from the Kern when the second whistle was blown. The response was to the second whistle. The witness says: "The first they blowed one whistle. Then they blowed one more. They didn't answer the first whistle. Then they blowed one more, and then they answered with two."

Page, McCutcheon, Knight & Olney, of San Francisco, Cal., C. E. S. Wood, of Portland, Or., and Ira A. Campbell, of San Francisco, Cal., for libelant.

C. W. and G. C. Fulton, of Astoria, Or., and Denman & Arnold, of San Francisco, Cal., for respondent and claimant.

WOLVERTON, District Judge (after stating the facts as above). The question to be resolved is which of these two vessels was at fault in bringing on the collision, or whether both are blamable for their part in the affair. The following is a rough chart of the river and its shore lines at and near the place of collision:

EUREKA FISHERY

COOPER'S POINT C

K

WATERFORD LIGHT

WATERFORD FISHERY

"K" represents the place where the collision occurred. "C" is a designation for Cooper's Point, made by counsel in the examination of one of the witnesses. It is claimed by libelant's counsel that Cooper's Point is approximately five-eighths of a mile above the place of collision, which is probably near the correct distance. The line from "C" to "K" shows approximately the ship's course for vessels of the class and size of the Elder. As they round Cooper's Point and pick up Waterford Light, they bear away from the Washington shore on or near the line indicated until they pass the point where the collision occurred. I speak of rounding Cooper's Point. As a matter of fact, the change in course is only slight, as the vessels run near the Washington shore for some distance above. The Elder on the night of the accident, according to the testimony of her officers, had just rounded or passed Cooper's Point and had straightened up, not on her regular

course, but on a course a half-point to starboard of the Kern, the Kern's presence in the river below having been discovered at that time, and the pilot intending to bear off the Washington shore opposite the Kern some 400 feet, which would leave the Kern to the Elder's port from 300 to 600 feet, thinking, as he says, he could go in through there with safety. It was then that the officers say they blew one whistle as a signal to the Kern that the Elder intended to pass to her starboard, the ship running nearly at full speed. This would put the distance of the Elder above the Kern approximately half a mile when the Elder gave the signal. She slowed up, her officers say, but continued on her course a half-point to the starboard of the Kern, and, getting no response from the Kern, she subsequently blew another whistle, a single blast as before. At this time Patterson, the pilot on the Elder, puts his distance from the Kern at from 1,000 to 1,500 feet, and it was then, according to witnesses for the Elder, that they got the first response from the Kern. They were not certain whether the response was a cross or a danger signal. The vessel was at once ordered hard astarboard, and full speed astern. The Elder being constructed with a left-hand propeller, the effect of the execution of the order would be to throw her bow to port and her stern to starboard, thus giving her a curving course to port. The Elder was executing this maneuver when she struck the Kern.

On the other hand, the officers and deck hands of the Kern say they heard the first signal given the Kern by the Elder, and that the Kern answered at once with the danger signal, four short blasts. Very shortly the Elder gave another signal, which was also answered as before, with four short blasts. The Kern was heading approximately downstream. Such being her position, the Elder, if steering on her usual or the ship's course, would be approaching from an angle astern. This will be at once apparent from the above sketch. Moran, the pilot on the Kern, thinks the Elder approached directly for the stern of the Kern, as if she were going to split her up the center. The mate and the master concur in the view that the Elder was approaching, not directly from the stern, but heading for the Kern's starboard quarter or midships. All the witnesses on the Kern agree that the lights of the Elder—port, starboard, and masthead lights—were all plainly visible as she approached the Kern until after the Elder began swinging to port. It was almost at this instant that the collision took place, or so shortly after that it was difficult to estimate the time. In the course of her maneuver to get in between the barges constituting her tow, the Kern's helm had been thrown to port, and on observance of the near approach of the Elder she was ordered full speed ahead. The effect of the execution of this order would be to throw her stern to port and bow to starboard, thus increasing her angle with the usual ship's course. Moran says she had begun to execute this maneuver, and had proceeded ahead 30 or 40 feet when the Elder struck her. The Elder struck her starboard quarter at an angle of about 34 degrees. This is a physical fact shown by the course of the Elder's bow as it extended into the hull of the Kern.

Capt. Church, in charge of the Hercules, relates that while navigating his vessel up stream to pick up the empty barges he exchanged the passing signal with the Elder, and that the Elder signaled the Kern just as she was passing the Hercules below Cooper's Point, inside of 1,000 feet. First Officer Hale on the Hercules lends corroboration to this. Capt. Patterson's custom was to signal the vessel ahead when about half a mile distant. From these witnesses it would appear that the Elder sounded her first signal to the Kern when approximately half a mile distant, and this I am constrained to believe to be the fact. However, the Elder may have been nearer, and possibly somewhat farther away. No implicit reliance can be placed upon the estimate of the witnesses on board the Kern as to how far distant the Elder was when she blew her first whistle, as they were looking into the darkness, without physical objects by which to determine the fact with relative accuracy. At the distance of a half-mile away, if the Elder kept her speed, say from 10 to 12 miles per hour (she was probably running at a faster rate), she would reach the Kern in from 2½ to 3 minutes, the Kern being dead in the water. The Elder, however, I am led to believe, slowed down, which would increase the time relatively. It is further probable that her speed was not greatly checked until the pilot's order to put her full speed astern was executed, as there is no evidence that her engines were backing, so that she was running at a stiff rate up to that juncture.

All the witnesses on the Kern speaking as to the fact concur in the statement that the Elder was heading almost, if not directly, for the Kern, for they saw all the Elder's running lights, which is a demonstration in itself, and discredits absolutely the testimony of the officers on the Elder to the effect that she was running on a course having the Kern a half-point on her port bow. If she had been, the evidence would indicate that the Elder's green or starboard lights would have been shut out from the Kern, and as the Elder approached the angle would have been increased, more perfectly obscuring her green light. It is problematic as to just how near the Elder had approached the Kern when she blew her second whistle. The distance is variously estimated from 1,000 or 1,500 feet to very near at hand. Arneson says, "She was pretty close to us then." From either point of view, she kept her course until that time; that is, she was either running directly for the Kern, or with the Kern one half-point on her bow; in my view, directly for the Kern. A thing which appears to be practically certain is that the Elder at this point put her helm hard astarboard, and reversed her engines to full speed astern, which gave her a curving course to port, and yet she collided with the Kern. From the expert testimony it would seem that, if she had been 1,000 feet distant when she began to execute the maneuver, she would probably have cleared the Kern and her tow, or stopped before reaching her. If within 500 feet, the result would have been problematical. Possibly she even then would have cleared the Kern. This would make it appear that the Elder was not much, if anything, beyond 500 feet from the Kern when she began to execute her maneuver to port, and she might have been much less.

[1] As to whether the Kern gave response to the first passing signal of the Elder there is a sharp conflict in the testimony. The officers of the Kern, consisting of the pilot, first officer, mate, chief and assistant engineers, and a seaman, all concur in saying they heard the response given to both the first and the second signal of the Elder. Besides these witnesses, the captain of the Hercules and a fisherman testify that they heard all the signals—two from the Elder and two, consisting of four short blasts, from the Kern, and the mate on the Hercules heard both responses. All the witnesses on the part of the Elder testifying to the fact say they did not hear any response whatever to the first signal of the Elder. Applying the rule that the testimony of witnesses affirming that they heard or saw a thing is entitled to greater weight than the negative testimony of other witnesses who affirm that they did not hear or see it, the greater credence must be given to the testimony of libelant's witnesses. As applicable to collision cases, it has been held that:

"The established rule is that the testimony of officers and witnesses as to what was actually done on board their own vessel is entitled to greater weight than that of witnesses on other boats, who judge or form opinions merely from observation." The Alexander Folsom, 52 Fed. 403, 411, 3 C. C. A. 165.

See, also, The Alberta (D. C.) 23 Fed. 807, 810; The Sam Sloan (D. C.) 65 Fed. 125, 127.

Further than this, I am impelled to the firm conviction that the Kern gave prompt response to the first signal of the Elder with four short blasts of her whistle; and, not only this, I am of the opinion that the officers of the Elder testifying, or at least one or more of them in authority, did hear such response from the Kern, and that the Elder is chargeable with positive knowledge that it was given. I base this latter deduction the more readily upon the testimony of the captain and mate of the Hercules and the fisherman, who were even less advantageously situated for hearing such signal than the officers of the Elder.

[2] Now, to apply the rules of navigation, which constitute a cardinal factor in determining the fault and to which of the two vessels it is attributable. As a preliminary statement to the rules adopted by Congress approved June 7, 1897 (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2875]), relating to the prevention of collision upon certain harbors, rivers, and inland waters of the United States, it is premised that a vessel is under way when she is not at anchor or made fast to the shore or ground. According to this, the Kern was a vessel under way. An overtaking vessel "shall keep out of the way of the overtaken vessel." Article 24. "When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think

it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals. The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel." Rule 8 of article 18. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger." Article 27.

[3] In view of these rules, it is clear that it was the bounden duty of the Elder to keep out of the way of the Kern. Having heard the response to the Elder's first passing signal, the duty was imposed upon the Elder not to attempt to pass the Kern until such time as it could be safely done, at which time the vessel ahead is required to signify her willingness by blowing the proper signal. This makes the vessel ahead the judge as to when the overtaking vessel can safely pass. The Elder slowed down, but kept her course—this in face of the fact that she was steering straight for the Kern, and approaching her at a rapid rate. Continuing in this way, the Elder again asked permission to pass. The Kern again refused; and then it proved too late to avoid the collision, for it occurred in spite of the energetic efforts of the Kern to prevent it.

The fact that the Elder struck the Kern at an angle of 34 degrees in no way conflicts with the theory that the Elder was steering straight for the Kern. It is altogether probable that the Kern was pressing ahead at the instant with her helm aport, which carried her stern somewhat to port, and the "curving" motion of the Elder would naturally bring her into collision at some angle. The Elder should have been eagerly mindful of her rapid approach to the Kern on the course she was steering, and should have avoided running so near to the latter as to put her in peril of a collision. Under the circumstances, she was at liberty to depart from the letter of the rules and steer to the starboard of the Kern, notwithstanding the refusal of the latter to let her pass—this to avoid "immediate danger." Article 27, Sup. See The North Star, 151 Fed. 168, 172, 80 C. C. A. 536.

The expert witnesses, including Moran and Anderson of the Kern, seemed to be of the view that if the Elder had steered to starboard at a distance of 1,000 feet, or even 500, she would have avoided the Kern. She would have avoided her absolutely, and without question, if she had been running on the course of a half-point to port of the Kern when the first signal was given, and continued on that course. Furthermore, if she had so continued until she gave her second signal, the probabilities are that she would by that time have so indicated her course to the Kern that the latter would have signified permission to pass as requested.

Supposedly at that time such would have been the case. Counsel for respondent suggest that the response given by the Kern indicated, not only that the Kern was in jeopardy, but that it was not safe for

the Elder to pass on any course to starboard of the Kern or between her and the Washington shore. The clear reply to this suggestion is that the Elder knew the river, and knew, also, that the Kern was engaged in navigating barges downstream, and it is not at all probable that she was so misled by the signals of the Kern. Such is my conviction. But, if it be that the Elder did not hear the response to her first signal, it was a grave fault to approach so near to the Kern on the course she was running as to jeopardize the situation. She should either have done what she did do in the extreme, or have departed from the rules and gone to starboard of the Kern. In either event, the collision would not have happened. This would be the case whether she knew the Kern was "dead in the water" or moving. The emergency was one which she ought to have been on her guard about. She knew that the Kern and Hercules were in the habit of exchanging tows in the river, and she met the Hercules almost at the very time that she sounded her first signal to the Kern, and ought to have known that the Kern was likely to be engaged in the very thing that she was trying to do at the time, namely, to pick up her tow. I do not deem that it was a contributing fault on the part of the Kern that she was picking up her tow in the fairway. The James T. Easton (D. C.) 27 Fed. 464.. She certainly had a right to navigate with her tow in the fairway, and I have been cited to no authorities holding that she was remiss in using the fairway to make fast to her tow.

It is stoutly urged that the Kern was rendered in fault because Moran refused permission to the Elder to pass, under a mistaken interpretation of article 18, rule 8. Moran watched to ascertain whether the Elder changed her course after signaling for permission to pass before he acted, and, observing no change, he refused permission. He candidly concedes that his impression of the meaning of the rule was that it required the Elder to change her helm before the assent should be given. In this he was in error, for the rule requires the contrary; that is, that the overtaking vessel shall change her course upon receiving assent from the overtaken vessel—not before, but after, receiving such assent.

The question is a serious one, and not free from difficulty; but I have concluded that the mistake of Moran was not the proximate contributing cause of the collision. I am satisfied that Moran did not refuse his consent to the Elder to pass arbitrarily, or with any wanton purpose of vexing her or impeding navigation. He assumed for his own safety that he ought to withhold his assent because the Elder was heading directly for his boat, upon the mistaken idea that she ought to have changed her course at once after signaling for permission to pass the Kern. The Elder, nevertheless, should have heeded the signal from the Kern, and if she had, and had acted with the same energy that she did on getting the second signal from the Kern, there would have been no collision. The only damage that either boat would have sustained would be some delay to the Elder. Thus it is manifest that the proximate cause of the collision was the omission of the Elder to take prompt action upon getting the response from the Kern to avoid, if possible, any contact with the latter. I reach this conclusion the more readily from the circumstance that the Elder was the over-

taking vessel, charged not only with the duty of keeping out of the way of the Kern, but also with the burden of showing that the fault of the collision was with the Kern. The reasoning of Betts, District Judge, in The Governor, Fed. Cas. No. 5645, is apposite:

"If the Worcester and the Governor had been running in opposite directions, the collision might probably have been deemed to be so far the result of mere casualty and misadventure as to leave each vessel to bear for herself the consequences of the accident falling upon her. But the fact that they were running in the same direction, the one astern of the other, imposed upon the rear boat an obligation to precaution and care which is not chargeable to the same extent upon the other. In the light of this principle, the circumstances of the present case manifestly cast the burden of proof upon the Governor. She was astern, and was seeking to run past the Worcester. She had a right to the advantage of her superior speed, and, under such circumstances, it would have been tortious and blamable conduct on the part of the Worcester designedly to intercept the Governor, to crowd her off, or to baffle her in that effort. But it devolves upon the Governor to show the prudence of her own conduct, as well as to prove negligence or misconduct on the part of the Worcester. It was not the duty of the latter boat to veer from her course so as to open a passage for the Governor, or to lend her any facility in aid of her purpose to pass. We may censure any rigid adherence to strict right by which one competing boat interposes embarrassments in the way of her competitor, and may regret the want of a magnanimous and liberal course of conduct which might relieve a vessel of superior speed and endeavoring to get ahead from delay or difficulty in accomplishing that object. But the court is only empowered to adjudicate the legal rights of the one and the responsibility of the other."

See, also, the reasoning of the court in The Fontana, 119 Fed. 853, 856, 56 C. C. A. 365.

This leaves but one other contention to dispose of, which relates to the fact that the Kern had no designated lookout in service at the particular time. The absence, however, of such a lookout was void of any causative effect in bringing on the collision. The officers in charge of the Kern discovered in due time the approach of the Elder, and the action taken was in pursuance of such discovery, and of the movement and signals given by the Elder.

I hold, therefore, that the collision was due solely to the fault of the Elder, and that she must stand accountable for whatever damage was inflicted upon the Kern. The amount of the damages must be ascertained from testimony yet to be adduced.