## THE BOWDEN.

### THE DECATUR H. MILLER.

### THE BOWDEN v. THE DECATUR H. MILLER et al.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1897.)

#### No. 188.

1. COLLISION—STEAMSHIPS IN HARBOR.
   A steamship which, on approaching another steamer lying or moving in a narrow harbor channel, fails to get any answer to her signals, should have her attention arrested thereby, and is bound to take every precaution to avoid risk of collision, even from the negligence of the other.

2. SAME.
   A steamship without steam up, which has been moved from her dock, and is lying in the channel of a narrow harbor, while her tug is preparing to tow her, is in fault if she fails to maintain a lookout for approaching vessels, so as to apprise them of her helpless condition.

Appeal from the District Court of the United States for the District of Maryland.

Robert H. Smith, for appellant.

William Pinkney Whyte (Daniel H. Hayne and Joseph Whyte on the brief), for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

SIMONTON, Circuit Judge. This is an appeal from the decree of the district court of the United States for the district of Maryland, in admiralty. It is a case of collision growing out of these facts:

The Decatur H. Miller is a steamship of the Merchants' & Miners' Transportation Company. She is 260 feet long, 38 feet beam. Her sides are 20 feet above the water line, and she has houses on deck adding to her height out of water. The docks of this line are in the inner harbor of the port of Baltimore, which at this point is from 900 feet to 1,000 feet wide. She was in her dock on the early morning of the 18th May, 1896, and had discharged all her cargo, with the exception of about 400 tons. Her owners desired to have her moved lower down the harbor, for the purpose of finishing discharge of cargo. To that end, as she had no steam in her boilers, the tug Venus was employed. This tug was owned by the steamship company, and was customarily employed for the purpose of moving its ships under these circumstances. The Miller was lying in her dock, with her starboard side to the wharf. The tug made a line fast to her port quarter, pulled her stern foremost into the stream, her head pointing up the harbor, and then pulled her around until her heading was reversed, pointing down the channel. She was then about 300 feet from the line of wharves. In the meantime the Bowden, a fruit steamer, was coming up the harbor of Baltimore, on the way to her own dock, not far above that at which the Miller had been lying. When she was opposite the quarantine station she had reduced her speed to about seven miles per hour, and as she got near and into the inner harbor she slowed down to about four miles an hour. She was in a bend of the river, and as she reached Shryock's Wharf, at the end of the bend, she ported her helm so as to pass along the front of the wharves. Just before, or perhaps just as, she reached this point, she nearly came into collision with a water boat; starboarding her helm to avoid the collision, and immediately porting it again. As she rounded Shryock's Wharf she came in sight of the Miller, lying as above stated. At that moment the tug Venus had cast off the line to the Miller, blowing a long blast of her whistle as she did so, and had backed, and gone in on the starboard quarter of the Miller. She was completely hidden from the Bowden, and was not seen by any one on that vessel. The Bowden, coming in sight of, and when about 1,200 feet away from, the Miller, blew one blast of her whistle, indicating that she would pass to port between her and the wharves. No response whatever came from the Miller or from the tug Venus, and it appears that this signal was not heard either on the tug or the steamer. Having no response, the Bowden kept on her way without slacking or stopping until she was within 300 feet of the Miller, when, observing that the Miller was gradually approaching her, the Bowden put her helm hard a-port, and reversed at full speed. Her momentum was not checked, nor her direction changed, and she struck the Miller on her port side at an angle of 45°, making an incision about 12 feet from top to bottom, and about 3 feet wide. The Miller was towed to her wharf, where she filled and sank about 20 minutes after the collision. At the time of the collision the Miller, without steam herself, and not yet fastened to the tug, had no headway on her. She must, however, have been in motion, sagging under the influence of the wind, a light breeze, on her starboard side, and perhaps under the mo-

mentum of the turn given to her by the tug in changing her heading from up to down the stream. There was no tide. Notwithstanding this, the Miller had not diminished the space between herself and the wharves less than 150 or 175 feet. The Bowden was 27 feet beam. She steered badly, and did not readily yield to her engines when reversed.

The court below, after hearing the witnesses, was of the opinion that there was sufficient space for the Bowden to pass between the Miller and the line of wharves, and that the disaster was due in great measure to the fact that the pilot on the Bowden had gone too near to the Miller without porting sufficiently, relying upon the Miller to get out of his way; that he thus lost his head, and, when he reversed his engines, found that the Bowden would not obey her helm. This finding of the fact by the court below has great weight with this court. The Lucy and The Spring Garden, 42 U. S. App. 100–104, 20 C. C. A. 660, and 74 Fed. 572. And a careful review of the testimony leads us to the same conclusion. It is clearly not a case of inevitable accident, which must be understood to mean a collision which occurs when both parties have endeavored by every means in their power, with due care and caution and a proper display of nautical skill, to prevent the occurrence of the accident, and when the proofs show that it occurred in spite of everything that nautical skill, care, and precaution could do to keep the vessels apart. The Maybey and Cooper, 14 Wall. 215; The Grace Girdler, 7 Wall. 196. In these narrow channel ways, the utmost care and precaution are required, not only to prevent collision, but to avoid the risk of collision. There is no room for theory. The rapid succession of facts must be closely observed, and must govern. The Bowden may have concluded that the Miller was under way. But when she gave her whistle and received no response, nor observed any movement on the part of the Miller, her attention should have been arrested, and it was her duty to have taken every precaution to avoid the result of negligence, even, on the part of the Miller. Instead of doing this, she pursued her course unchanged, notwithstanding her defect in steering, until it was too late either to change her direction, or to reverse and back in time to prevent the collision.

But was the Miller wholly without fault? She had the right to do as she did,—to be towed out into the stream. This, it seems, was the custom with all the steamers of her line. But absolutely helpless as she was when she reached the midchannel, in a narrow seaway, the entrance and exit of all vessels using the inner harbor, it behooved her to take and exercise every precaution possible. While elaborate rules have been adopted, intended to prevent the risk of collision, still so important is it that every possible precaution should be taken, that these same rules themselves provide that nothing contained in them shall exonerate any ship from the consequences of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. The Sunnyside, 91 U. S. 208. "The rul-

ing principle of the court is that an obligation rests on all vessels found in the avenues of commerce to employ active diligence to avoid collisions." New York, etc., Co. v. Calderwood, 19 How. 246; The Maria Martin, 12 Wall. 31. The Miller on this occasion had no one whatever on the lookout. Her acting master and her crew were all busily engaged in duties which occupied all their attention, precisely as if she were tied to a wharf. Not only was the blast of the approaching steamer not observed; it was not even heard by any one on her deck. True, she could not have responded either with one blast or two blasts, for that would have asserted that she was proceeding either with a port or a starboard helm, while in truth she could have done neither. But she could have blown the danger signals, indicating her own helpless condition. The Roslyn, 22 Fed. 687. Had there been a lookout, or had her acting master realized his duty, signals could have come from the tug, or the tug itself have been put in motion and the disaster averted; for, according to all the testimony, a slight change of direction would have prevented the collision. Certainly an early indication to the Bowden would have removed her mistake. It is manifest that the indifference and negligence of the crew of the Miller contributed to this accident. Great care is required of a large steamer, leaving her dock, to see that no damage is done to other vessels near her. The City of Paris, Fed. Cas. No. 2,767, 14 Blatchf. 531. The position of the Decatur H. Miller was closely, if not wholly, analogous to a sailing vessel in stays, and there is no doubt that it was the duty of other vessels to keep clear of her. But even in such case it is the duty of those on board to take a due look around beforehand to ascertain that no ship is in the neighborhood, likely to come on them. Mars. Mar. Coll. 447, and note. See, also, The John Fenwick, L. R. 3 Adm. & Ecc. 500. In The American Eagle, 27 Fed. 465,—a case closely resembling this in some, but not all, respects,—a steamer, the Eagle, collided with a tug engaged in making up her tow in East River, New York Harbor, and, while so doing, helpless to get out of the way of other vessels. In that case the court says:

"Being in full view of all approaching vessels, and at a sufficient distance to enable them to keep away from her by getting her tow in readiness to move, the pilot of the tug had no reason to suppose the Eagle would not go on one side or the other of him. When he saw the Eagle coming towards him, he hailed her to keep off. There was nothing he could do more, since he could not safely move forward or backward."

There was no such effort on the part of the Miller, no action or precaution whatever, and consequently she also was in fault. Under these circumstances, the damages should be apportioned. Let the case be remanded to the district court, with directions to take such order therein as will be in accordance with this opinion.