UNITED STATES of America and Alexander H. Hood, Appellees,

v.

M/V WUERTTEMBERG, and Partenteederei Wuerttemberg, Appellants.

No. 9109.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 11, 1963.

Decided April 13, 1964.

* Sitting by designation.

Harold A. Mouzon and B. Allston Moore, Jr., Charleston, S. C. (Moore & Mouzon, Charleston, S. C., on the brief), for appellants.

Thomas F. McGovern, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., Terrell L. Glenn, U. S. Atty., and Morton Hollander, Thomas P. Simpson, and Leavenworth Colby, Attys., Dept. of Justice, on the brief), for appellee United States.

Ben Scott Whaley, Charleston, S. C. (Barnwell, Whaley, Stevenson & Patterson, and Nathaniel L. Barnwell, Charleston, S. C., on the brief), for appellee Alexander H. Hood.

Before HAYNSWORTH, Circuit Judge, and BARKSDALE and CRAVEN, District Judges.

HAYNSWORTH, Circuit Judge.

In these actions arising out of a collision between two ships, we affirm the District Court's finding of fault on the part of the Wuerttemberg, for those findings are supported by substantial evidence, but we think fault on the part of the Swerve also plainly appears.

Early one summer's morning a narrow belt of fog lay across the entrance to Charleston Harbor. In the summer, fog is unusual there, but frequently there is an early morning haze. Outside the narrow fog belt, it was hazy that morning of June 25, 1958, but, generally, visibility was two or three miles. The sky was clear, there was no wind, and the waters of the harbor were calm and placid.

Apparently, the narrow fog belt did not have clearly defined limits. The haze thickened on either side of it, so that the belt of fog was not obvious to either one of the four ships which approached it at about 6:00 o'clock that morning.

The USS Red Fin, a submarine sailing on the surface and conned by a civilian Charleston bar pilot, was outbound and behind her was the outbound USS Swerve, a minesweeper. Inbound were the USS Penobscot, a Navy tug, and the M/V Wuerttemberg, a German freighter. The outbound Red Fin made a normal port to port passing of the Penobscot and of the Wuerttemberg in Mount Pleasant Range. The Swerve, approaching Mount Pleasant Range from South Channel, waited until the Penobscot entered Rebellion Reach before it turned southeast into Mount Pleasant Range, but the efforts of the Swerve and Wuerttemberg to avoid each other were ineffective, and the Wuerttemberg struck the Swerve a glancing but damaging blow.

In these actions, the United States, as owner of the Swerve, seeks damages from the Wuerttemberg, while Captain Hood, a Naval officer aboard the Swerve, seeks damages of the Wuerttemberg for personal injuries he suffered in the collision.

At 0532, the inbound Wuerttemberg picked up an experienced Charleston bar

pilot at the sea buoy. The pilot had come out earlier in the Pilot Boat and had encountered no fog. There was some haze, but visibility was quite adequate.

After picking up her pilot at the sea buoy, the Wuerttemberg, 492 feet 10 inches long, with a beam of 61 feet 4 inches and a draft of 25 feet, 6 inches, stood in for Charleston at 14 knots. At 0614 she rounded buoy 20, marking the juncture of Fort Sumter and Mount Pleasant Ranges. Shortly thereafter she passed the outbound Red Fin. An officer-candidate serving as lookout on the Wuerttemberg's wing left his post to dip her flag to the Red Fin, but shortly returned to his post where noise from the exhaust stack may have interfered with his ability to hear fog signals, then being sounded by the Penobscot and Swerve in the fog that lay ahead.

When the Wuerttemberg passed close by buoy 20, it came to a course of 318°. The course of the Mount Pleasant Range is 317½° but the Range narrows some 1100 yards northwest of buoy 20. The tide was close to maximum ebb. In the upper portion of Mount Pleasant Range, the tidal current sets to the east toward Sullivan's Island. In anticipation of that the Wuerttemberg's course was shortly altered to 315°.

At buoy 20, the Wuerttemberg's pilot could not see Fort Sumter, approximately 1.7 nautical miles off his port bow, nor could he see the tower at Fort Moultrie on Sullivan's Island, approximately 1.4 miles off his starboard bow. He could see other parts of Sullivan's Island abeam to starboard. Finally, realizing he was entering an area of more restricted visibility, the pilot ordered the Wuerttemberg's engines to half ahead at 0620, reducing her speed from 14 to 8.2 knots.

A minute or two later, the Wuerttemberg heard a fog signal from the Swerve and almost immediately sighted the Swerve dead ahead. The Wuerttemberg immediately signaled a turn to starboard and her rudder was put hard to the right at about the same time, 0622. Her engines were ordered slow ahead, dead slow ahead, and slow ahead. Responding to her right rudder, the Wuerttemberg's heading changed from 315° to 345°, but, meanwhile, the Swerve was making sternway with her rudder hard to the left. The Wuerttemberg struck her a glancing blow damaging the port side of the Swerve and injuring Captain Hood, and with slight damage to the Wuerttemberg's plates under the flare of her bow.

The Swerve was a new, wooden-hulled minesweeper 172 feet long, with a beam of 35 feet and a draft of 10.6 feet. She had four engines and two screws, which were equipped with variable pitch propellers giving her very great maneuverability. Reversing the pitch of her propellers, she could go from full ahead to dead in the water in twenty to thirty seconds, advancing only 240 feet.

The Swerve departed the old minecraft base on Ashley River at 0548. The weather was clear and visibility adequate. Aboard her was Captain Hood, a Naval Inspector, and she was going to sea for her final acceptance trials. She proceeded down the Ashley River at 8 knots. At 0603, she entered South Channel, increasing her speed to 10 knots at 0604 and to 12 knots at 0605. At 0608, her bridge realized that her range markers could no longer be seen nor could Sullivan's Island, so her speed was reduced to 10 knots, and was again reduced a minute later to 8 knots, and at 0610 it was further reduced to 4 knots. She began to navigate by radar and to blow fog signals. Her radar reported ahead the pips of the Penobscot and the Red Fin, and the Swerve stopped twice to let those vessels clear the way ahead of her.

At this point, it may be helpful to note a bifurcation of the channel at the end of Mount Pleasant Range to an inbound vessel. The left-hand arm of the Y is South Channel, out of which the Swerve was approaching Mount Pleasant Range, while the right-hand arm of the Y is Rebellion Reach, used by inbound vessels with destinations on the Cooper River. The Red Fin had come down out of Rebellion Reach and the Penobscot was

steering for Rebellion Reach as the Swerve waited in South Channel. The Red Fin had entered Mount Pleasant Range sometime before the Penobscot came out of it, for the passage of those two vessels was accomplished near the middle of Mount Pleasant Range.

Finally, the Penobscot's pip on the Swerve's radar indicated that she had entered Rebellion Reach, after which the Penobscot turned off and anchored in an anchorage between the arms of the bifurcated channel. The Swerve reached buoy 25, at the head of Mount Pleasant Range, at 0618. She had used her radar and her Underwater Object Locator to pick up the buoy, which was visually observed when abeam at 0618.

In South Channel, the Swerve had been on a course of 88°. As she approached buoy 25, however, she came to 115° to bring her closer to the buoy. One minute after passing buoy 25 abeam to starboard, she came to 125° at 0619 and held that course until 0621 when she came to 148°.[1]

If the Swerve maneuvered as her log reports after leaving buoy 25, she would have been at the time of collision far out in the dredged channel of Mount Pleasant Range. Not only would she have held for sometime a heading easterly of that of the Range, but the tidal current would have been setting her to the east of her heading. As officially determined, the average tidal current in the vicinity of buoy 25 at maximum ebb is 2.5 knots, which, adjusted to the actual time, would give an indicated average current of 2.4 knots. That is determined by average readings at two depths, only one of which would have affected the relatively shallow draft Swerve, and the Government expert testified that the surface current actually affecting her would exceed the average. The reading at a depth of 6.7 feet may exceed that at 17 feet by as much as %10ths of a knot. Records of the ebb current near buoy 20 during one period, disclose an average reading at a depth of 6.7 feet of 2.58 knots. On many of those days, the reading at a depth of 6.7 feet exceeded 3 knots and, on a number, was as high as 3.7 knots.

The average direction of the ebb current in the vicinity of buoy 25 is 115°, some 23° to the left of the course down Mount Pleasant Range. The Government's tide expert reported a reading as far to the east as 98°, however, so that the actual set of the ebb current may have been considerably more or less than 23° to the left of the course of the range. In any event, the actual set of the ebb current that morning would have substantial effect upon the actual position of the Swerve, and any estimate which failed to take it into account, inevitably, would have been wide of the mark.

The Swerve's radar picked up the Wuerttemberg at an initial range of some 3,000 yards. The Swerve was then in the vicinity of buoy 25. The radar operator thought he reported this information to the bridge, but no one on the bridge recalled it later. The Swerve's Combat Information Center did not again report on the Wuerttemberg until the range was down to 1400 yards, and it was then reported that the range was closing fast. The final radar report on the Wuerttemberg said the range had closed to 700 yards and almost immediately, or very soon, thereafter, the Wuerttemberg was sighted five to ten points off the Swerve's port bow and heading, apparently, directly for the Swerve.

The Swerve heard the Wuerttemberg's signal that she was going to starboard,

---

1. The District Court found that the Swerve was on 125° for only approximately 30 seconds. The Swerve's navigator, testifying from his recollection, did say they were on 125° for only approximately 30 seconds and then came to 137°, the course of Mount Pleasant Range, after which they went to 148°. The log does not bear out his recollection of the course changes and all other witnesses agree that they went directly from 125° to 148° without ever having steadied on 137°. If she had held to 125° for only 30 seconds and then went directly to 148°, the Swerve would have been much closer to buoy 25 at the time of the collision than anyone has suggested.

and later saw the Wuerttemberg's bow swinging to the right. The Swerve, however, had gone full emergency astern, with full left rudder, intended, with sternway on, to swing off her bow. Going astern, she sounded a three-blast signal to indicate what she was doing. As the Wuerttemberg's bow swung, the Swerve finally went full ahead on right rudder, and, as the two ships brushed by, each went left to swing her stern away. This was at 0622, Swerve time.

After the collision, the Wuerttemberg came to course 280° to avoid Sullivan's Island, and, at 0625, two minutes after the collision, dropped anchor. When the fog lifted, she found herself 500 yards southeast of buoy 25 on the extreme right side of the dredged channel of Mount Pleasant Range. What courses the Swerve took after the collision are not recorded. Some ten minutes later, she anchored in the vicinity of bell buoy 23, which is some 200 yards off the other side of the dredged channel from that on which the Wuerttemberg was anchored.

From the foregoing, it is apparent that the collision would never have happened if each ship was where she thought she was. If the Wuerttemberg passed close by buoy 20 as she entered Mount Pleasant Range and came to 318° which she held until she passed the outbound Red Fin, coming then to 315°, and holding that until she went to starboard in an effort to avoid the collision, she would have been well within her right-hand portion of the channel when the two ships sighted each other. Members of the Swerve's company, on the other hand, testified that they were never in the dredged channel, but always to their right of it and came to 148° before the collision in an effort to pass close by bell buoy 23 some 200 yards to their right of the Mount Pleasant Range channel. They knew where they were, they say, from readings reported to the Bridge from the Underwater Object Locator in the Combat Information Center, which is said to be capable of accurately locating underwater objects at ranges up to approximately seven hundred yards and even to defining the channel's contours.

It may be noted that the Wuerttemberg's estimate of her course and position is corroborated to some extent by the Red Fin's pilot who saw her properly placed after she entered Mount Pleasant Range. Only a radical change of course could have brought her from her position when she met and passed the Red Fin to the position the Swerve claims to have been at the time of the collision. The Wuerttemberg's version may be corroborated to some further extent by her position after her turns to the right and back to the left when she anchored two minutes after the collision on her right-hand edge of the channel. The testimonial version of the Swerve's company, however, is not supported by the successive maneuvers recorded in her log. A plot of those courses at the 4 knots she was making would show her to have been in the channel, and allowance for the tidal current, which may not be ignored, would put her farther to the left and ahead of that plotted position. How far to the left and how far ahead would depend upon the starting point when she passed buoy 25, as to which there was substantial variation in the testimony of members of her company, and the actual speed and direction of the tidal current that morning. The fact that she came ultimately to anchor out of the fog in the vicinity of bell buoy 23 might corroborate to some extent the Swerve's testimonial version were it not for the fact that she did not anchor there until some ten minutes after the collision, and the record is silent as to what courses she steered during that interval and at what speed.

Obviously one vessel or the other was far from where she was thought to have been, and the District Court did not resolve the controversy. It found as a fact that the Wuerttemberg took the courses with the speed changes she claimed to have followed after passing the Red Fin, while the Swerve was found to

have been navigated as the navigator testified. If each finding was correct, the vessels would not have collided.

 We need not undertake to resolve this factual controversy, for the fault of each vessel plainly appears without it.

The Wuerttemberg makes no attempt to justify her conduct as appropriate under fog conditions. For fog conditions, her speed was too great, she had no bow watch, and, while there is a suggestion that she may have attempted to use her radar, the radar was either malfunctioning or the momentary attempt to use it was ineffective. Her position is that she approached the scene of the collision under hazy conditions, but without fog and without realizing she was running into a fog bank. She contends that at that time of year her pilot, who had come out on the Pilot Boat a few hours earlier, had no reason to suspect fog and was not negligent in proceeding without anticipation of it.

When he rounded buoy 20, however, the pilot, who had thought he had visibility of two or three miles, knew that he could not see Fort Sumter or the tower at Fort Moultrie. They were less than one and three-quarter miles and one and one-half miles, respectively, from buoy 20, and some of that distance had been eaten away when the Wuerttemberg went to half ahead. The pilot had every reason to realize that visibility was tremendously reduced, and that, without radar, he was proceeding blindly into a situation which might call for close passage with other outbound vessels. That he did not go to slow ahead or take other precaution, when he had abundant reason to believe that visibility had been reduced to the danger point, warranted the District Court's conclusion of fault on the part of the Wuerttemberg. The original reduction of speed to half ahead may not have been incautious if taken early enough, but when the landmarks could not be seen when the Wuerttemberg had approached to within less than one mile of them, further action was required.

The Swerve, on the other hand, ignored the obvious chances she had to avoid risk of collision. By her radar she knew of the high speed approach of the Wuerttemberg. Her radar showed the Wuerttemberg dead ahead on what appeared to be a collision course. It is said that in every narrow channel meeting situation, the pip of the approaching vessel on the radar's scope will indicate an apparent collision course until shortly before the passing is accomplished, but the narrow channel meeting was not the only alternative open to the Swerve. On the Swerve's right, at buoy 25 and below as she proceeded down Mount Pleasant Range, there were several hundred yards of open water for vessels of her draft. She could have gone well to her right and given the Wuerttemberg a wide berth. Instead, she deliberately chose a close passage of the Wuerttemberg, altering her course from one leading diagonally across the channel to 148° only moments before the Wuerttemberg was sighted. Her last minute intention was said to have been to steer generally toward bell buoy 23, but then and earlier more radical movements to starboard were open to her without risk of collision or of running aground. Had she gone to starboard into shallower waters, but of ample depth for her, she could have anchored or maneuvered until the rapidly closing Wuerttemberg had passed.

When the Wuerttemberg was sighted just off the port bow of the Swerve, then on a course of 148°, the Swerve's company agreed that the Wuerttemberg appeared to be headed straight for the Swerve. They heard the Wuerttemberg's signal that she was going to starboard, and Article 18 of the Inland Rules[2] requires each vessel on such a head and head meeting to go to starboard to effect a port to port passing. The Swerve, however, reversed her engines and was actually making sternway on a hard left rudder, backing into the path of the turning Wuerttemberg until an instant before the collision occurred. Clearly,

2. 33 U.S.C.A. § 203, Art. 18.

had she gone ahead on right rudder, a safe passage would have been effected.

The Swerve's skipper may have been confused as to the available distance between the two vessels when they first sighted each other. He was coming out of thick fog into an area of greater visibility, while the Wuerttemberg was proceeding into areas of decreasing visibility. This may help to explain the fact that the estimates of the distance between the two vessels when they first sighted each other visually varied greatly, the Swerve's estimate being considerably less than the Wuerttemberg's. The pilot on the Wuerttemberg did not regard the situation as one *in extremis*, but the Swerve's skipper did. His only thought appears to have been to get sternway on to soften the blow with no thought of a maneuver which would have avoided the blow. The fact that there was time for the Wuerttemberg's right rudder to take effect and swing her head substantially to starboard would tend to support the Wuerttemberg's estimate of the distance between them upon the first sighting and her pilot's appraisal of the situation as one calling for avoiding action by each vessel by going to starboard, but not justifying a departure from the rules.

 Under all the circumstances, including her emergence from deep fog, we would not be inclined to hold the Swerve responsible solely because of what she did after visually sighting the Wuerttemberg. The fact that she put herself where she did, however, leaves her with no excuse. Holding a course easterly of that of the channel, knowing that the Wuerttemberg was rapidly closing on an apparent collision course when she could have avoided altogether a close passage leaves no room for the operation of the rule that a vessel is not to be responsible for her master's mistakes of judgment after he has found himself *in extremis*. Even *in extremis* a vessel's master is supposed to act with a level head and upon judgments wrought of long experience, but appearance after the event of a safe alternative which went unrecognized at the time is not always a basis of condemnation of judgments made *in extremis*.[3]

 Whether, however, the Swerve's very unfortunate maneuvers after she sighted the Wuerttemberg are excusable, her earlier neglect of a safe passage is enough to hold her at fault. She needlessly elected a close passage in fog, knowing the Wuerttemberg was rapidly closing, apparently on a collision course, when, by a turn into safe waters to the right, she could have avoided all risk of collision. A close passing in fog is dangerous at any time. Deliberately undertaking it when there were other obvious and safe alternatives was a fault for which the Swerve should be responsible. Judge Learned Hand said, " * * * it must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid."[4] When safe means of avoidance of risk of collision are obviously and readily at hand, their neglect is inexcusable.

We agree with the District Court's conclusion that the Wuerttemberg was at fault; we disagree with its conclusion that the Swerve was not.

The case will be remanded to the District Court for such further orders and proceedings as are not inconsistent with this opinion.

Affirmed in part; reversed in part and remanded.

3. United States v. SS Washington, 4 Cir., 241 F.2d 819; Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 175 F.2d 632; Cuba Distilling Co. v. Grace Line, 2 Cir., 143 F.2d 499.

4. Ocean S.S. Co. v. United States, 2 Cir., 38 F.2d 782, 784. See also The Bowden, 4 Cir., 78 F. 649, 650; Esso Standard Oil Company v. Oil Screw Tug Maluco I, 4 Cir., 332 F.2d 211 (decided April 15, 1964.)