**ESSO STANDARD OIL COMPANY,**
a foreign corporation, Libellant,
Appellant,

v.

**OIL SCREW TUG MALUCO I and BARGE #127, their furniture, engines, tackle, apparel, etc., in rem, and M. F. Martin, Jr., and American Dredging Co., as Owners and/or Operators and/or Charterers of said vessels, in personam, Respondents, Appellees.**

No. 9211.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 21, 1964.

Decided April 15, 1964.

Robert M. Hughes, III, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellant.

Robert R. MacMillan, Norfolk, Va. (Breeden, Howard & MacMillan, Norfolk, Va. and James J. Bierbower, Washington, D. C., on brief), for appellees Oil Screw Tug Maluco I and M. F. Martin, Jr.

Before SOBELOFF, Chief Judge, and BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

A collision, "head and head", between the tanker M/S Esso Potomac and Barge 127, in tow of the tug Maluco, on the

Potomac River at Alexandria, Virginia, about 1 o'clock A. M., April 30, 1959 is the subject of this appeal. Appropriate libels posited the issue of fault on cross charges of the tanker and the tug.[1] The District Court concluded the tanker was solely to blame; on its fact findings we think the tug was also derelict.

At the time, the Woodrow Wilson Memorial Bridge connecting Virginia and Maryland in an east-west span was under construction. Cofferdams had been built from the Alexandria side, the west shore, several hundred feet eastwardly into the river towards Maryland, but none of the superstructure had been erected. At its face the farthest dam fronted on the water, north and south, for about 100 feet. A waterway of 200 feet remained for river traffic—north and south—between the dam and the Maryland side of the corridor marked by a lighted piling. There was also a blinking red light at each of the two off-shore corners of the cofferdam.

The night was clear, the vessels in plain view of each other for more than 2 miles, each showing proper navigational lights, and yet they collided, stem to stem, in the passageway. Despite available water of 200 feet, the tanker upbound, north toward Washington, entered the western half of this channel. Her prow struck the leading, square end of the scow, fortunately hurting no one and inflicting only relatively slight damage to the vessels.

The tanker's length was 256 feet, her beam 40 feet. The pilothouse was 77 feet from the bow and 16 feet above deck. Tug Maluco had an overall length of 65 feet, a breadth of 17½ feet; the scow a length of 120 feet and a breadth of 40 feet. While the wheelhouse of the tug was only 10 feet aft of her stem, it was 75 feet from the forepart of the tow. The scow was lashed or otherwise made fast alongside the port bow of the tug. So rigged, the tug though astern over-lapped the scow's starboard quarter for about 10 feet beyond her trailing edge.

Violation by the tanker of the narrow channel rule is not deniable. Art. 25, Inland Rules of Navigation, 33 U.S.C. § 210. Notwithstanding prior mariners' notices of a 200-foot opening at the bridge site, her navigator conceived only a 100-foot width there. Hence, by keeping to the right half within the mistaken bounds she nevertheless steered into the wrong side of the fairway. Other delinquencies are laid to her, including the absence of a lookout on the forecastle deck and the overuse of her searchlight just before and as she transited the strait. This light, the tug asserts, so completely blinded her helmsman, that when it was quenched—a "matter of seconds before the impact"—"[f]or the first time he saw the tanker's running lights" about 150 feet dead ahead.

The 1000-watt, mile-range beam was oppressively focused upon the tug as it was played along the dam to scan the obstruction and read the four green lights which had been installed by the Coast Guard eight hours before. Two of them were below and two above the dam, for a distance of about 1000 feet on each side. Turning over at only 4 knots, the tanker did not see the side lights of the flotilla until 700 feet away although her wheelsman had sighted the searchlight rays of the tug from 2 miles downriver.

When 600 feet north of the dam, the tug went to half-speed, 1½ knots, because of the dam and the "oncoming vessel." At 300 feet above the dam the tug sounded one blast of her whistle indicating a port to port passing. Receiving no answer the tug flashed her searchlight to starboard, confirming she would stay to the right.

About 2 minutes later the tanker whistled once, immediately following it with 4 blasts, the danger signal. Art.

---

1. Esso Standard Oil Company owned and operated the tanker; American Dredging Company, Inc. owned the barge; and M. F. Martin, Jr. owned and chartered the tug to Southern Transportation Company, Inc., who later was dropped as a party.

18, Rule III, 33 U.S.C. § 203. Then she went full speed astern, sounding her whistle 3 times indicating her engines were in reverse. Art. 28, Inland Rules of Navigation, 33 U.S.C. § 213.

No special lookout had been stationed at the bow of the scow. The navigator of the tug had followed the water for several years but he had not run the Potomac in the collision area longer than two weeks. The crew consisted of the master, mate, two rivermen in the engine room and a cook. Also aboard was a Government inspector, who came on deck when he heard the danger signals. He witnessed the bad hap.

From the time the tug began the approach until her ill fortune, only the mate was in the pilothouse. The engine-room-crewman who also served as a lookout was not on deck—"[he] was out someplace." The master was asleep in his quarters immediately adjoining the wheelhouse, but he emerged 4 or 5 minutes before the impact on hearing the tanker's warning blasts. Although "we were fixing to get in trouble" nevertheless he retreated to his cabin to dress. When the skipper reappeared, the ships had collided.

I. With the liability of the tanker admitted, the next inquiry is the behavior of the tug. She was at fault in many respects, but none so flagrant as the absence of a special lookout on the scow or at least in not otherwise providing sufficient observation when nearing the dam. Art. 29, Inland Rules of Navigation, 33 U.S.C. § 221, declares:

> "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a *proper lookout*, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. * * *" (Accent added.)

"[P]erformance of lookout duty," Judge Soper declared for us in Anthony v. International Paper Co., 289 F.2d 574, 580 (4 Cir. 1961), "is an *inexorable* requirement of *prudent* navigation." (Accent added.)

While this circuit has not gone quite as far as equating this neglect with a violation of the rules of the road, Judge Soper in the Anthony case further stated the consequences of the neglect in this way:

> "[W]e hold that the omission to perform this duty is *so grave a default as to give rise to a strong inference that it contributed to the accident and to impose upon the vessel the heavy burden to show by clear and convincing evidence that it did not so contribute.* Such a holding is surely justified in view of the more drastic rule laid down by experienced admiralty courts as a necessary safeguard for careful navigation." (Accent added.)

The District Judge mistakenly held the tug to the stricter judgment: that the failure to maintain a lookout is the equivalent of a statutory fault. This misconception is academic, however, because the findings of the District Judge, we think, do not prove the tug's innocence, even under the less stringent law of this circuit. They do not negative her conduct as at least causal in part. The determination of the trial judge—that the absence of a lookout did not contribute to the accident—was based on the conclusion that on account of the tanker's searchlight it is "highly unlikely" a lookout on the scow "could have given any information not already known by the tug pilot."

Just what a sentinel at the tow's bow could have seen can now be only surmise. Conjecture is not "clear and convincing" evidence. He might have been outside the cone of the floodlight or been able to shield his eyes from its direct glare or reflection on the water. It must be remembered that he could have been more than 40 feet to the left, as well as 70 feet forward, of the tug's wheelhouse, and he had a range of 40 feet in which to

change his viewpoint laterally. Anyway, the law demanded this effort by the tug. As Judge Hand said, " * * * it must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid." Ocean S.S. Co. of Savannah v. United States, 38 F.2d 782, 784 (2 Cir. 1930). This admonition was given by us too in The Bowden, 78 F. 649, 650 (4 Cir. 1897).

But if a special lookout was not needed, the tug must plead the adequacy of her general lookout in order to meet her burden. In this we note that the entire responsibility for the tug's control, operation and direction that night had been put on the mate alone. Not even the other shipman, ordinarily serving as a lookout, was there to help him. If the tug was providing the watch required of her by law, why: (1) could she not determine which side of the channel the tanker occupied when she was half a mile away; (2) could she not tell whether the tanker was proceeding to port or starboard; and (3) why until the tanker was within 150 feet of her, could the tug not ascertain her location in the channel? In answer, the tug explains that she was dazzled by the tanker's searchlight and so the tanker's navigational lights were obscured to the tug. But a searchlight is not an unexpected hazard for a steersman. The tug had also used her own in the area. While the tanker's was mismanaged, resort to it was "necessary," the District Judge noted, "because of background lights and the confusion created by four flashing green construction lights established along the western channel only approximately eight hours prior to the collision." Further confusion was caused by the red lights at the corners of the dam and there was also a need to spot the red lights on the opposite dolphins.

With this limited vision the tug was not able to keep the vigil contemplated by the requirements of a "proper lookout." A myopic tug with a protruding and displaced tow had no place in a narrow channel at midnight.

The mate's inability to appraise the circumstances from the wheel affirms the wisdom of demanding the added diligence of a forward lookout. Moreover, the tugmaster seems to have been oblivious to the obligation of his vessel to maintain a constant attentiveness and to act upon what it raised. Although he realized the vessels were on collision course some 4 minutes before contact, he abnegated his responsibility to endeavor to rescue or at least to minimize the imminent jeopardy of his command. Under apposite conditions we held in The City of Portsmouth, 143 F. 856, 858 (4 Cir. 1906), and reaffirm here, the tug cannot be absolved.

■ II. Violations by the tug of good practice and of a specific statutory rule are also evident. The mate complains that the tanker did not answer his blast. But without such response and without knowing the position of the tanker, yet aware he must encounter her, the tug nosed on into perilous waters. On this point, the mate testified:

"Q. And you continued in ignorance of his [the tanker's] position until the vessels were 150 feet apart when, for the first time, you saw his side lights; is that correct?

"A. Yes, sir, at a slow speed."

* * *

"Q. You did not try to pick up the running lights of this vessel approaching you even though you saw it 2 or 3 miles off?

"A. That's right."

The tug asks what more was required to avoid collision, inasmuch as she was already hugging the right bank when struck. The answer has just been manifested. When at a half mile she could not fix the tanker in the channel, good seamanship required the tug to stop and await clarification of the situation. With the adverse tide she could have remained at a standstill with engines merely idling. Her signal not acknowledged, the tug should have sounded her doubt, and so alerted the tanker to alter a menacing course. The neglect was non-

observance of the statutory mandate of Article 18, Rule III, 33 U.S.C. § 203, now worthy of repetition:

> "Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

Rigid compliance with the doubt-rule was demanded, and the necessity expounded, in James McWilliams Blue Line v. Card Towing Line, 168 F.2d 720 (2 Cir. 1948). There, two tugs, each with a tow, met end to end in the Hudson River. The upbound towboat when 1000 feet away blew once for a port to port passage. Receiving no answer, she continued on for some 200 feet and let go a second blast. The other tug then sounded danger signals and backed, but thereby threw her tow into collision with the first-signalling tug. The Court said:

> "The faults of the two vessels were unequal, and we cannot but be tempted to follow the judge and hold the * * * [unresponding tug] alone at fault. Not only had she made up her tow most negligently, but she must have been grossly inattentive not to answer the first signal of the * * * [other tug]. Nevertheless, we have not been able to find a way to exonerate the * * * [signalling tug]."

> * * *

> "*The failure to blow the alarm at the time when she blew the second single blast was a statutory fault;* and it is apparent * * * that the * * * [signalling tug] has not proved that it could not have caused the collision * * *." (Accent added.)

The same Court had previously emphasized, "[T]here is no more important rule." A. H. Bull S.S. Co. v. United States, 34 F.2d 614, 616 (2 Cir. 1929).

Our circuit has consistently insisted upon this exaction. In the City of Chester, 78 F. 186, 189 (4 Cir. 1897) we approvingly adopted the words from The Catskill, 38 F. 367, 368 (2 Cir. 1889) thus:

> "*On the contrary, with a very plain intimation that the other vessel was willfully or heedlessly continuing on a course which made collision imminent,* he kept on, in the hope that at the last moment she would discover her error, and seek to rectify it. For thus keeping on until the safety limit was reached and passed the district judge held the navigator of the Baltimore in fault, and his decision is affirmed." (Accent added.)

See also The Bowden, supra, 78 F. 649, 651 (4 Cir. 1897).

■ Aside from the lookout-breach, the tug Maluco having violated Rule III of Article 18 must acquit herself of every reasonable possibility of contribution to the misfortune. This is indeed a hard burden, especially when as here it is contended that the omission was not a factor in the outcome; but it is salutary and fundamental doctrine. In less incriminating circumstances we said in Wood Towing Corporation v. Paco Tankers, 152 F.2d 258, 261 (4 Cir. 1945):

> "While the causative effect of the tanker's dereliction is not obvious, the rule is that when a vessel is violating a statutory rule intended to prevent collisions and a disaster occurs, *she must show not only 'that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.'* The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148. Lie v. San Francisco & Portland Steamship Co., 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726." (Accent added.)

The Maluco has not redeemed herself from this presumption of guilt.

■ The major-minor fault rule invoked by the District Judge in exculpating the tug we need not discuss. While the offenses of the tanker were grave,

the failings of the tug were not minor, and certainly not so insignificant as to be eclipsed beyond consideration.

In sum, both vessels were at fault and damages should be divided.

Reversed and remanded.